## Beadles, Wood & Co. *v.* J. W. Ownby.

1. COTTON FUTURES. *Money advanced. Suit to recover. Defense.* It is a good defense to a complainant's bill to recover money advanced, that the advances were made in the purchase of *cotton futures* with the distinct understanding that no cotton was to be delivered or price paid therefor, and that the intention of the parties was to speculate in the rise and fall of the price of cotton.

2. SAME. *Agents in buying.* It makes no difference that the complainants were acting merely as agents of the respondent in the purchase, and had no interest in the transaction except their commissions as agents.

### FROM CARROLL.

Appeal from the Chancery Court at Huntingdon. JNO. SOMERS, Ch.

HAWKINS & TOWNES for complainant.

HAWKINS & MCKENZIE for defendant.

COOKE, J., delivered the opinion of the court.

The complainants were commission merchants and cotton factors in New Orleans, Louisiana, and the bill

Beadles, Wood & Co. *v.* Ownby.

in this case was filed to recover of the respondent, Ownby, the sum of $891.76, alleged to have been advanced by them for the respondent, at his special instance and request, with which to buy cotton for future delivery. The real defense relied upon, is, as alleged by the answer, that the advances, if made at all, were made in the purchase of what is styled *cotton futures*, with the distinct understanding between the complainants and respondent, that there was to be no cotton delivered or the price paid therefor, and that the object and intention was, as understood between complainants and respondent, to speculate in the rise and fall of the price of cotton; or in other words, that it was a mere wagering transaction on the future prices of cotton in New Orleans, in which both complainants and respondent participated, and hence the complainants are not entitled to recover.

The complainants were members of the New Orleans Cotton Exchange, and on December 22, 1881, they purchased upon the said cotton exchange, and subject to its rules and regulations, of one Roberts, for the defendant, one hundred bales of cotton, to be delivered in the month of March, 1882, at the price of $12\frac{32}{100}$ cents per pound; also upon December 27, 1881, they purchased, in like manner, for the respondent, one hundred bales of cotton of one Jones & Co., to be delivered in March, 1882, at the price of $12\frac{23}{100}$ cents per pound; and, also, on January 10, 1882, they, in like manner, purchased for the respondent, of one A. C. Hayne, one hundred bales to be delivered in April, at the price of $12\frac{56}{100}$ cents per pound, and

on the same day they purchased for respondent, one hundred bales of cotton of one J. T. Clay, to be delivered in April, at the price of $12$\frac{56}{100}$ cents per pound. By the rules of said cotton exchange, and consequently by the terms of said contracts, either party was required to put up or deposit sufficient sums of money, termed margins, when required by the other party, to cover the difference between the stipulated price and the price current, as cotton might rise or fall in the market, and if either party, upon such notice, failed to put up such margins, the other party had the right to declare the contracts forfeited and settle them according to the difference between the contract price and the market price of the cotton at time of the forfeiture, and have the same paid accordingly.

On February 8, 1882, the complainants advanced for the respondent, in pursuance of such notice, the sum of $610 to protect his purchase of two hundred bales to be delivered in March, and, on the same day, they also, in like manner, advanced the further sum of $681.76 to protect his purchase of two hundred bales to be delivered in April; $400 of this amount had been furnished by respondent to them for that purpose, and the residue of $891.76 was advanced out of their own monies by the complainants for him. The price of cotton still continuing to decline, further advances as margins were required to protect said contracts, which the complainants were unable to advance, and the respondent refusing to do so, said contracts were declared forfeited and closed out before

Beadles, Wood & Co. *v.* Ownby.

maturity, and the respondent having refused to pay the amount so advanced for him by the complainants, this bill was filed to recover the same, as above stated. The only question necessary to be considered is, were these wagering contracts, and was the money advanced in aid of them by the complainants with the knowledge that they were such? If so, they can not recover, but if not, they can: 3 Lea, 745, and authorities there cited. The testimony in regard to said contracts is as follows: On December 20, 1881, the respondent addressed to the complainants the following letter:

"*Dear Sirs*—I hereby enclose postoffice order for $100 for which please receipt. I wish you to use it in cotton futures; buying and selling as you would your own. For instance, if New York March gets to $12\frac{40}{100}$ or $12\frac{45}{100}$, buy one hundred bales, and if you think it is not likely to get there, buy at higher figures. Do as you think best, and if you buy or sell, telegraph in some character, as it's against the law to deal in futures here. If you buy or sell, *protect*. Do best you can and I may send more."

To this letter, the complainants replied, on December 22, 1881, as follows:

"Your favor of the 20th, containing postoffice order for $100, duly to hand. We do not expect to see New York Marches go down to $12\frac{40}{100}$, but if decline continues to-morrow, we think you had better go in for 100 Marches, and should they go ten points lower, we would suggest you take 100 more. Should we buy, will telegraph, 'House burned yesterday $12\frac{40}{100}$,' which means, bought one hundred bales March $12\frac{40}{100}$. Accept thanks for order."

On December 22, 1881, same date as above, complainants wrote again to respondent at Huntingdon, Tennessee, the place of his residence, as follows:

"We received an order by telegraph this morning to buy you 100 bales March delivery, which we have executed at $12\frac{32}{100}$. This is a considerable decline since yesterday morning. We hope it may pay you a handsome profit. We may have low prices until sometime in January, when we expect a sharp advance. We have $100 postoffice order for your credit."

Beadles, Wood & Co. *v.* Ownby.

On December 27, 1881, complainants again wrote to respondent, as follows:

"Your postal card of December 26th instant came to hand late this afternoon, only a few minutes before the closing of the cotton exchange, saying: 'If March cotton points to $12\frac{28}{100}$, buy me one hundred bales.' We immediately executed the order at $12\frac{23}{100}$ and wired you the purchase. We desire as margin, one dollar per bale. We will keep your margins good and protect you."

On January 4, 1882, respondent wrote the complainants as follows:

"I hereby send postoffice order for $200 as margin for my cotton which I want you to protect. Got your telegram a few minutes ago. Surprised to see such a decline after your and other opinions. Short crop must be a myth."

A postscript added, as follows:

'Now if cotton should react or get to bottom, and you don't need all money I have there as margin, you may invest additional amount over at low figure."

In reply to which complainants wrote respondent on January 6, 1882, as follows:

"Yours of the 4th instant received. Amounts stated inclosed. You have credit by $200. We shall protect contract. Should the market become steady and receipts fall off, we will invest in two hundred bales more for you. Very large receipts this week with large stocks on hand has encountered a bear raid that the bulls have not been able to resist successfully. One house in Liverpool (Newfork & Co.) has sold through H. & B. Beer of this city, two hundred and fifty thousand bales the last four weeks. We have to resist capital and manipulations. If we can hold up two weeks longer we will have them by the throat; at least that is our opinion."

On January 6, 1882, respondent wrote to complainants as follows:

"If you will purchase for me without any more money than the $400 sent one hundred bales April, you may do so. If March should get as low or lower than 12 or $12\frac{05}{100}$, that is to say, I wish to hold three hundred bales for the $400 if I can, the last one April, when March gets to 12 or $12\frac{05}{100}$. Of course, if it should never go up *I would pay, but not this month. I wish my present purchase protected any way.*"

Beadles Wood & Co. v. Ownby.

On January 9, 1882, complainants wrote to respondent in reply to the above, as follows:

"In reply to your favor 6th, would say, we would urge not to hold any Marches or to buy any. Before you invest in any more futures, we would suggest that a continuous advance can not occur. And when you get twenty-five points profit on any purchase, take in your profit. And when a depression occurs, go in again. You respond so promptly to our call that we will invest for you when you desire it."

On January 10, 1882, complainants telegraphed respondent:

"Bought two hundred April at $12\frac{56}{100}$."

From the above correspondence, it can be readily seen that the complainants did know what the transactions were upon which they advanced these sums of money for the respondent, and that they were advanced at his request for the purpose of protecting his purchases, and, as above stated, the only question is, whether the transactions themselves were illegal.

The respondent himself testifies that he gave his first order to complainants for the purchase of cotton through an agent of theirs, one J. R. Smith, and that it was said or understood by both of them, "that there would be no actual cotton delivered," and that said agent told him that it was understood that he was not to take the actual cotton; that they dealt upon the rise and fall. He also testifies, that said agent agreed or said the complainants would protect his purchases for one dollar per bale, or said that would be sufficient to protect them. Smith's testimony directly contradicts these statements of the respondent. He testifies that complainants were to act as the agents of respondent in the purchase of cotton; that

they had no interest in the contracts whatever except their commissions upon the purchases as cotton factors. Complainant Beadles testifies positively, that every contract of purchase made for defendant was made according to the rules of the New Orleans Cotton Exchange and for actual delivery of cotton, and could have been enforced if the cotton had been demanded; that there was never any agreement or understanding, either expressed or implied, that no cotton was to be delivered under said contracts, or that settlement should be made according to the price of cotton at the date of purchase and sale; that by the rules of the cotton exchange, in accordance with which these contracts were made for respondent, all contracts were forfeitable on the failure of either party to make margins good when notified by the other party to do so. When contracts are forfeited, they are closed out and settled under the rules of said exchange, according to the difference between the purchase and sale of the cotton; that all contracts are made for cotton, and upon any and all of them cotton can be demanded or tendered by either party and enforced by the actual delivery of the cotton at maturity; that both parties, buyers and sellers, were bound to keep margins good during the existence of the contract, and, on failure to do so, the contract is declared forfeited and settlemant may be demanded; that after the complainants had advanced for respondent the amounts as above stated to protect his contract, they were unwilling to advance for him any further, and the price of cotton still continuing to decline, further

margins were demanded upon said contracts, of which they notified respondent, and also notified him that they could not advance any more for him, and unless he furnished the additional margins demanded, the contracts would be declared forfeited; and that respondent refused to advance any further, and said contracts were declared forfeited, and closed out according to the rules of the cotton exchange. He further testified, that if respondent had kept his margins up, upon the maturity of the contracts, if the cotton had been tendered, the firm could have commanded the money upon it to have paid for it. He further testifies, that contracts for future delivery are very often sold many times before maturity, and a great many are forfeited, and many of them are settled upon maturity according to the difference in prices, but in all cases the cotton is actually delivered when demanded or tendered by either party, and which either party has a perfect right to do; that complainants had no interest in said contracts except their commissions for making said purchases, and had no knowledge of any intention upon the part of either of the parties to said contracts not to demand or tender the cotton upon their maturity. Woods, the other partner in said firm, testified substantially the same. The testimony further shows, that the respondent had been in the habit for many years of dealing in these contracts, and was well acquainted with the rules and regulations by which they are governed. These witnesses also testify, that there was no agreement on part of complainants to protect said

contracts for the price or amount of one dollar per bale, and the correspondence above set forth clearly establishes that there was no such agreement, although there is an opinion expressed in one of the letters that that even would be sufficient.

I was inclined to the opinion, that the complainants' right to recover was sustained by the preponderance of the testimony. But the chancellor and Referees both came to a different conclusion, and the majority of the court are of opinion that all the evidence, taken together, establishes the defense set up, that these were wagering contracts in regard to the future price of cotton, and that complainants, knowing them to be such, advanced said sums of money in aid of them, and hence can not be permitted to recover.

The exceptions to the report of the Referees will be disallowed, and the chancellor's decree dismissing the bill affirmed with costs.